## N. R. Bagley Co., Inc., v. Cameron, Commissioner of Banking.

*Securities—Dealers—Registration—Plan of doing business—Promise to repurchase securities sold—Golden rule—Securities Act of June 14, 1923.*

1. Upon the hearing of a petition for the reversal of the decision of the Commissioner of Banking, under section 19 of the Securities Act of June 14, 1923, P. L. 779, the court is not bound by the evidence received and considered by the commissioner. It is the duty of the court to hear and determine the question *de novo.*

2. In order to ascertain the good repute of an applicant for registration under the act, it is necessary for the Commissioner of Banking, under section 5, to inquire as to the applicant's previous history, record and associations; and this applies not only to an applicant for registration as a dealer, but also to the application of a registered dealer for the registration of agents or salesmen.

3. The plan of doing business of the applicant under the act must be construed to mean a formulated scheme for the accomplishment of the object or the attainment of the end sought by him in the sale of securities, including the various steps which have been thought out and decided upon for carrying out the project.

4. Whatever methods have been adopted by an applicant for registration, for the purpose of putting stocks and securities upon the market and selling them to the public, must be included in, and form part of, the plan of doing business.

5. When it appears from the evidence that there are inequitable methods of stock distribution on the part of corporations issuing the securities to be sold, which have been approved and adopted by the applicant for registration, such methods must be held to be a part of the applicant's plan of doing business.

6. The repurchase by a dealer of securities sold to customers who become dissatisfied is unsound as a matter of business policy; a promise to prospective customers to make such repurchase is ordinarily incapable of performance, and' its only purpose is to deceive ignorant purchasers and lull them into a feeling of apparent safety; hence, a plan of doing business based on such a policy, whether stated in the prospectus or by the salesmen in personal interviews with prospective customers, is unfair, unjust and inequitable.

7. A plan of doing business which includes the automatic advancement in price of the securities sold, not justified by the financial condition of the corporations issuing the securities, is unfair, unjust and inequitable.

8. A plan of doing business which includes statements calculated to deceive and mislead the public is unfair, unjust and inequitable.

9. The proposed plan of doing business of the applicant for registration in the instant case, held to be unfair, unjust and inequitable.

Petition for the reversal of the decision of the Commissioner of Banking of the Commonwealth of Pennsylvania, under the Securities Act of 1923. C. P. Dauphin Co., Commonwealth Docket, 1923, No. 64.

*Frayer Evans* and *Ruby R. Vale*, for plaintiff.

*J. W. Brown*, Deputy Attorney-General, for defendant.

WICKERSHAM, J., Dec. 12, 1923.—The petitioner represents that it is a corporation of the State of New York, registered as a foreign corporation in the Commonwealth of Pennsylvania, and that it has complied with all the statutes of this Commonwealth relating to the registration of foreign corporations and their "doing of business" therein; that the corporation took

VOL. 4—6

over the business of certain salesmen who were selling securities as a co-operative association and now conducts a business of dealing in and selling securities for the benefit of the salesmen who are its only stockholders; that its principal office is located at No. 220 North 19th Street, in the City of New York, and that it has branch offices in the State of Pennsylvania, located in the Widener Building, City of Philadelphia, and also in the cities of Allentown, Sunbury and Scranton; that on July 27, 1923, the petitioner filed its formal application, together with all information called for therein, and certified checks for the respective amounts required, with the Commissioner of Banking of the Commonwealth of Pennsylvania, praying to be registered as a "dealer" of securities under and in compliance with the Securities Act of the Commonwealth of Pennsylvania; that on Aug. 7, 1923, the Commissioner of Banking of the Commonwealth of Pennsylvania, without formal acknowledgment of the receipt of said application, and without and before hearing thereon, notified the petitioner to discontinue the sale of securities; that the petitioner immediately, upon receipt of said notice, notified all of its salesmen in Pennsylvania to suspend business, whereupon all business of the petitioner was suspended in this State; that on Aug. 15, 1923, N. R. Bagley, the president of the petitioner corporation, presented facts in support of his application to Einar Barfod and W. J. Fallows, deputy commissioners appointed for the purpose of considering the said application, giving them full and detailed answers to all inquiries by them made, and delivering to them the papers and documents more fully in detail described in the letter of transmissal accompanying said documents; after said hearing, the said deputy commissioners requested additional information, which information and all papers and documents relating thereto were prepared by the petitioner and were about to be sent to the Commissioner of Banking of the Commonwealth of Pennsylvania when the petitioner received formal notice of the refusal of its application for registration by letter dated Aug. 16, 1923, and signed "Peter G. Cameron," for the reason that the Commissioner of Banking was "not satisfied that the proposed plan of business of this corporation is fair, just and equitable."

From the decision of the Commissioner of Banking refusing to register it, the petitioner, under authority of section 19 of the said Securities Act, appealed to this court, alleging that the refusal of the Commissioner of Banking to register it was wrongful, without justification in fact or in law, and was an abuse of the discretion vested in him for the reasons set forth in said petition, and praying for a reversal of said decision of said Commissioner of Banking in this regard.

Sept. 14, 1923, we made an order directing that the prayer of the petitioner be allowed, and directed the Commissioner of Banking to appear and file an answer as required by the said Securities Act.

The answer of the Commisisoner of Banking admits the facts in paragraphs 1, 3, 4—with the exception that all information required was not forwarded with the application; 6, 7, 8—with the exception that no additional information was required, but that a volume of additional information of no value whatever was volunteered by Bagley; and 9—with the exception that the Commissioner of Banking was waiting for no additional information at the time the order marked "Exhibit C" was issued.

It is contended that the facts in paragraph 2 of the petition are admitted, except that the plaintiff does not state all the facts relating to the claim set forth in this paragraph. The respondent then proceeds, in paragraphs (*a*), (*b*), (*c*), (*d*), (*e*), (*f*), (*g*), (*h*), (*i*) and (*j*), to demonstrate that the methods

4 D. & C.

of doing business of the petitioner corporation were similar to those conducted by H. W. Dubiske & Co., of Chicago, Ill. The Commissioner of Banking sets forth, with great particularity and at length, the business methods of said Dubiske & Co.; that Dubiske & Co. was in such bad repute that four of its former representatives, E. A. Clayton, C. D. Sheetz, P. G. Whitman and Fred H. Whitman, left its employ and associated themselves in the stock selling business under the name of N. R. Bagley & Co.; that they afterwards incorporated under the name of N. R. Bagley & Co., Inc., and have since associated with themselves other persons formerly associated with Dubiske & Co., to wit, Maude C. Cooper, James Douglas Williamson and John Alfred Johnson, and that these people have continued the stock selling methods and offences of Dubiske & Co., particularly in the matter of deceptive promises to buy back securities from the dissatisfied investors or investors in need of cash, admitted by N. R. Bagley to be an entirely improper and unsound inducement. Particular objection was made to that section in the sale contract of N. R. Bagley & Co., Inc., attached to the answer and marked "Exhibit A," section 13 of which states, "It is the policy of this company to repurchase stock of all dissatisfied clients;" that N. R. Bagley & Co., Inc., then promised to eliminate this feature and did eliminate it from its printed forms, but continued orally to promise to repurchase the stock sold by said corporation.

The Commissioner of Banking makes answer to paragraph 10 of the petition as follows:

"The action of the Secretary of Banking was right and proper with full justification in fact and in law for the following reasons:

"(a) The petitioner had no reputation as a dealer in securities, except the ill-repute acquired by the former members of the H. W. Dubiske & Co. organization, who organized under the name of N. R. Bagley & Co. for the purpose of continuing the business methods and offences which brought the H. W. Dubiske & Co. organization into disrepute.

"(b) 'The petitioner has sold securities only through salesmen who, being financially interested in the profits,' are primarily concerned with the profits and have shown no regard whatever for the corporate name under which they acquire these excessive profits.

"(c) The representations which induced the sale of the securities, and printed in detail on the contract of sale, are false in whole or in part, grossly misleading and deceptive, to wit:

"1. In the matter of the Dickinson Cord Tire Corporation, section 4 of the contract states:

" 'Development, Experimental and Patent Expenses over a period of eight years have exceeded Four Hundred Thousand Dollars.' "

This is alleged to be wholly false.

"2. In the same contract, section 5 states that 'public offering of our securities not made until untility of machine was demonstrated to entire satisfaction of many of the best qualified judges in the Engineering World and after having the commendation of prominent tire manufacturers.' "

This is alleged to be false.

"3. Section 7 of the sales contract used by N. R. Bagley & Co., Inc., in the sale of the Dickinson Cord Tire Corporation stock says 'machines are installed under license, not sold, by which royalties are guaranteed. . . .' "

This is alleged to be false.

It is further alleged in paragraph (d) that many false statements with intentions to deceive have been made by the petitioner and its salesmen in the sale of securities.

N. R. Bagley Co., Inc., v. Cameron, Commissioner of Banking.

1. In the pamphlet marked "Form 3–10 M 4–1–23" and entitled "Nineteen Reasons Why a Man Should Buy Dickinson Cord Tire Corporation Shares," the sixteenth reason stated by N. R. Bagley & Co., Inc., is:

"Preliminary contract has been made with a European Syndicate of Bankers, whereby they will pay $500,000 in advance royalties for European Manufacturing Licenses."

This is alleged to be false.

2. In the sale of the securities of the Dickinson Cord Tire Corporation, N. R. Bagley & Co., Inc., describes it as an initial offering of 200,000 shares, "all of one class."

This is alleged to be false.

3. That the eighteenth reason stated by N. R. Bagley & Co., Inc., is as follows:

"On an agreed policy, the price of shares will be automatically advanced as the corporation assets are enhanced in value in the progressive state of manufacturing activity." It is alleged that the sale price of the stock was advanced unconscionably and that the representation with regard "to the progress and the manufacturing activity of the company which justified this increase in the sale price of the shares" was false.

(e) The petitioner has offered for sale and sold securities of only two corporations to the entire detriment of said corporations and to the purchasers of the said stock. "In addition to the manner in which the sale of the Dickinson Cord Tire Corporation stock is handled by N. R. Bagley & Co., Inc., at unjustifiable high cost to the public and with unconscionable small return to the corporation, N. R. Bagley & Co., Inc., has also sold the stock of the Double-Service Washing Machine Company in a manner unfair, unjust and inequitable."

For the reasons heretofore briefly set forth, the said Peter G. Cameron, Secretary of Banking, prays that the said petition may be dismissed at the cost of the petitioner.

The issue, therefore, which is squarely raised by the petition and answer appears to be whether the proposed plan of business of the petitioner is "unfair, unjust and inequitable," and whether the "petitioner, its directors, officers, etc., are of good repute in business."

The contention of the petitioner is that if it is found to be of good repute and that its method of doing business is fair, just and equitable, it then becomes the duty of the Commissioner of Banking to register it, regardless of the value of the stock it proposes to sell. It is further contended that we cannot inquire in this proceeding whether the stock has any real commercial value, that being a matter hereafter to be determined by the Commissioner of Banking, after the petitioner is registered, as provided in section 15, et seq., of the Securities Act.

On the part of the defendant the contention is: In order that the Commissioner of Banking may ascertain whether the method of doing business of the petitioner is fair, just and equitable, and that it is of "good repute in business," his department must inquire into the previous history, record and associations of the petitioner, as authorized in section 5 of the said act, and also he must inquire into the value of the stock which the petitioner proposed to sell, the methods of doing business of the corporation issuing the stock offered for sale by the petitioner, where said methods appear to have the approval of the petitioner, and whether said stock has a real value and is honestly issued, or whether its value is merely speculative. Without this knowledge, it is earnestly urged it would be impossible for the Commissioner

of Banking to intelligently determine whether the repute of the petitioner is good and the proposed method of doing business of the petitioner is fair, just and equitable or otherwise.

Section 19 of the act provides: "Any dealer, the salesman or agents aggrieved by any decision of the commissioner may file, within thirty days thereafter, in the Court of Common Pleas of Dauphin County, a petition against the commissioner officially as defendant, alleging therein, in brief detail, the action and decision complained of, and praying for a reversal thereof. Upon service of summons upon said defendant, returnable within three days from its date, the commissioner shall, within one week from such return-date, file an answer, in which he shall allege by way of defence the grounds for his decision, and such other grounds as shall in the meantime accrue or be discovered."

This is the first proceeding had under the provisions of the Securities Act of 1923. The duty of the court—whether on this appeal we were bound by the evidence received and considered by the commissioner, or whether it was our duty to hear and determine the question *de novo*—was raised and argued. In consideration of the wording of the act, we are of opinion, after carefully considering the matter, that we should hear and determine the question *de novo*. It appears that we are not only to consider the "grounds for his decision" on the part of the Commissioner of Banking, but "such other grounds as shall in the meantime accrue or be discovered." This result could not be accomplished if we were to consider only the matters presented to the Commissioner of Banking at and before the time he rendered his decision.

This case came on to be heard Oct. 15, 1923, whereupon testimony was taken, from which we find the following

### Facts.

1. The petitioner is a corporation organized and existing under the laws of the State of New York; has registered as a foreign corporation in the State of Pennsylvania; and has complied with all the statutes of this Commonwealth relating to the registration of foreign corporations and their "doing of business" therein.

2. Its principal office is located in the City of New York, and it has branch offices in the State of Pennsylvania, in the cities of Philadelphia, Allentown, Sunbury and Scranton.

3. The petitioner filed its application for registration as a dealer under the provisions of the Securities Act, approved June 14, 1923, on July 27, 1923.

4. The general plan and character of the business of the applicant was stated in paragraph 14 of said application for registration to be: "To sell securities where the enterprise is, in our opinion, of proven value and the product has a general demand or use, and the company has honest, competent management, on a co-operative plan, by direct solicitation, and so arranged that no one connected with the business can make any real money except out of the profits of the business."

5. The only securities which the petitioner proposed to sell at the time of the hearing were the stock of the Dickinson Cord Tire Corporation, incorporated under the laws of the State of Delaware, and the stock of the Double-Service Washing Machine Company, a corporation incorporated under the laws of the State of New Jersey.

6. The proposed plan of business of the petitioner is to sell securities upon the instalment plan through the instrumentality of salesmen recruited for

stock selling from men unfamiliar with banking or securities, who are instructed what to say and are then sent out to sell securities to people equally ignorant of the value of the said securities they are purchasing.

7. The authorized capitalization of the Dickinson Cord Tire Corporation, the stock of which the petitioner proposes to sell, was $2,000,000, consisting of 2,000,000 shares of the par value of $1 each.

8. The entire capital stock of this corporation was issued to F. S. Dickinson, the president of the corporation, in full payment of the purchase price of the patents and applications for letters-patent on methods of pneumatic tire construction and machines invented by Dickinson for the manufacture of cord tires, in consideration of which he assigned to the company all his rights, title and interest thereto, and all his right, title and interest on all further improvements thereon.

9. Out of the 2,000,000 shares received by President Dickinson, he donated to the company 950,000 shares of the par value of $950,000, the sale of which was to provide it with working capital.

10. The par value of the said capital stock was at a later date increased from $1 to $10 per share, so that there were then held in the treasury 95,000 shares available for sale to the public; subsequently the par value was changed from $10 per share to "no par value."

11. At the close of business on Dec. 31, 1922, 32,823 of said shares had been sold and fully paid up, which netted the company a working capital amounting to $160,547.27. There were then 62,177 shares held in the treasury as of Dec. 31, 1922. Of this number 5434 shares had been subscribed for and partially paid, the unpaid subscriptions thereof amounting to $102,372.69. At the time of the hearing the company had about $180,000 in bank, derived exclusively from the sale of its capital stock.

12. The N. R. Bagley & Co.—a partnership—was formed to sell the stock of the Dickinson Cord Tire Corporation to the public; it was afterwards incorporated as N. R. Bagley & Co., Inc.

13. The Bagley Company agreed to, and actually did, turn over to the Dickinson Cord Tire Corporation 75 per cent. of the gross amount received from the sale of the treasury stock.

14. The original selling price of this stock after Bagley & Co., Inc., the petitioner, took charge of the sale thereof, was $20 per share, and the price was, by said petitioner, increased from time to time until they were selling it at the price of $60 a share and until approximately 2000 shares were sold. The average price at which said stock was sold by Bagley & Co., Inc., was about $35 a share.

15. At the time of the hearing the said Dickinson Cord Tire Corporation had, as part of its assets, a model machine, which was the fourth machine that Mr. Dickinson had built; also the patent and designs and drawings.

16. No machines were either leased to or installed in the manufacturing plant of any company making cord tires at the time of the hearing; and the Dickinson Cord Tire Corporation had no income except the interest on the time deposit of $100,000, that being a part of the $180,000 the company had in bank.

17. The majority of the stock of the Dickinson Cord Tire Corporation assigned to Dickinson, and amounting, originally, to the par value of $1,050,000, was to be held in escrow and not to be sold until the corporation was upon a productive, paying basis. The burden of placing said corporation upon a paying basis was, therefore, placed upon the purchasers and owners

4 D. & C.

of the 95,000 shares of the treasury stock which was set aside to be sold to the public.

18. Paragraph 18 of the "Nineteen Reasons Why a Man Should Buy Dickinson Cord Tire Corporation Shares" provided that "on an agreed policy the price of shares will be automatically advanced as the corporation assets are enhanced in value in the progressive stages of manufacturing activity." The price of the shares of this corporation was advanced by the Bagley & Co., Inc., but the corporation assets were not "enhanced in value in the progressive stages of manufacturing activity."

19. The Double-Service Washing Machine Company is a corporation organized by members of N. R. Bagley & Co., Inc., the petitioner in this case. The incorporators—all people of Bagley & Co.—were P. G. Whitman, Fred H. Whitman and Claudia Hankinson; Mr. Clayton, Mr. Sheetz, Mr. Shepherd and Mr. Bagley came into the corporation after its organization.

20. The capital stock of the Double-Service Washing Machine Company was fixed at 50,000 shares, no par value, of which 26,000 shares were set aside—but never delivered to the inventor and designer—for the drawings, designs, patent and model machine and for services.

21. These 26,000 shares were placed in escrow in the hands of Mr. Whitman, the treasurer of said Bagley & Co. corporation, who was also one of the incorporators and one of the firm of Bagley & Co., and were not to be sold until the said Double-Service Washing Machine Company was upon a paying basis.

22. The said 26,000 shares of stock were distributed as follows: N. R. Bagley & Co., Inc., received 11,000 shares; Mr. Bagley received 1000 shares, Mr. Clayton 1000 shares, P. G. Whitman 2000 shares, Charles D. Sheetz 1000 shares, Robert Bentel, engineer, received 2500 shares, George Kaverech, the president of the company, received 5000 shares, and Dien, the inventor, received 2500 shares.

23. Bagley had no interest in the Double-Service Washing Machine Company patent; and, of the stock distributed as heretofore set forth, only Whitman paid $2000 for the 2000 shares he received, and Sheetz paid $1000 for the 1000 shares distributed to him; the others of Bagley & Co., Inc., did not pay anything for their stock.

24. The petitioner in this case received 11,000 shares of the stock of the Double-Service Washing Machine Company for financing the company, and, in addition, received 25 per cent. for selling the stock.

25. It was the policy of the Philadelphia office of the petitioner that Bagley & Co. would buy back anything that it sold, it being the idea that this was the golden rule in the investment business, and while in the latest copies of the contract for the sale of stock the resale clause was omitted, Radcliffe stated it was still the policy of the company.

26. A circular issued by N. R. Bagley & Co., Inc., described the stock of the Dickinson Cord Tire Corporation which said Bagley & Co. had for sale as an "initial offering." This statement was not true, as the stock of the Dickinson Cord Tire Corporation had been upon the market and some of it was sold prior to its offer for sale by the petitioner.

27. N. R. Bagley & Co., Inc., had no "previous history, record and associations" as a dealer of securities which could establish its good repute as such, except the "previous history, record and associations" of its organizers, officers and managers.

28. At least two of the directors of said corporation and some of the sales managers in Pennsylvania were connected, prior to the organization of Bagley & Co., with a security selling organization known as H. W. Dubiske & Co., of Chicago.

29. The said H. W. Dubiske & Co. adopted an objectionable system of selling securities, and the previous securities selling record of said company was such that it withdrew from Pennsylvania before the said Securities Act went into force and effect.

30. The objectionable plan of doing business of Dubiske & Co. was that securities were not sold on their merits by people experienced in the security business and competent to pass judgment on the securities they were offering for sale, but said securities were entrusted for sale to men and women recruited from all walks of life, totally inexperienced and incompetent in the securities business and acting as salesmen among people of their own standing, inexperienced in financial competency.

31. This method of doing business was engrafted upon and practiced by N. R. Bagley & Co., Inc., in the sale of securities and in the manner of recruiting its salesmen and agents.

32. The petitioner, as one of its proposed plans of doing business, agreed to repurchase the stock of dissatisfied purchasers up to the amount of $10,000, which was stated to be applying the golden rule in the investment business.

33. Paragraph 6 of the statement of facts regarding the financial and business standing of the Dickinson Cord Tire Corporation, issued and used in its stock selling activities by the petitioner, provides, *inter alia:* "Without solicitation a market for over 200 machines from leading tire manufacturers is presented to us."

This statement we find to be untrue, misleading and calculated to deceive intending purchasers of the stock of said corporation.

34. Paragraph 7 of the statement of facts regarding Dickinson Cord Tire Corporation, issued by the petitioner, provides as follows: "Machines are installed under license, not sold, by which royalties are guaranteed, the royalty exacted being only a small proportion of the saving effected in manufacturing cost."

This statement was misleading, as there were no machines installed under license, and, therefore, no royalties could have been guaranteed at the time the statement was issued.

### Discussion.

The parties plaintiff and defendant in this case are proceeding under the provisions of the Securities Act, approved June 14, 1923, P. L. 779, entitled "An act for the registration and regulation of certain individuals and entities selling, offering for sale or delivery, soliciting subscriptions to or orders for, or undertaking to dispose of, inviting offers for, or inquiries about, or dealing in any manner in securities defined herein; conferring powers and imposing duties on the Commissioner of Banking, and otherwise providing for the administration of this act; prescribing penalties and making an appropriation."

As appears from the facts which we have found, the petitioner made application to the Commissioner—now entitled the Secretary—of Banking of the Commonwealth of Pennsylvania for registration as a dealer upon the blank form of application prepared by the said Commissioner of Banking "to sell securities, where the enterprise is, in our opinion, of proven value and the product has a general demand or use and the company has honest, competent management, on a co-operative plan of direct solicitation and so arranged

4 D. & C.

that no one connected with the business can make any real money except out of the profits of the business," as provided in section 5 of said act.

The Commissioner of Banking requested additional information from the petitioner as to its previous history, record and associations, which inquiry is authorized in section 5 of the said act, which provides: "Such application shall also contain such additional information as to the applicant's previous history, record and associations as may be required by the commissioner." From this inquiry it appeared that N. R. Bagley was president of the petitioner corporation; C. D. Sheetz was vice-president; P. G. Whitman was treasurer; E. A. Clayton secretary; S. H. Sheetz district manager; C. E. Radcliffe office manager; J. D. Williamson office manager; M. C. Cooper office manager; M. L. Swab office manager.

E. A. Clayton, a former agent of the stock selling concern known as H. W. Dubiske & Co., of Chicago, Ill., but later selling stock for himself—together with C. D. Sheetz, also a former salesman of the Dubiske Company—directed the attention of Mr. Bagley to the Dickinson Cord Tire machine and requested him to make an examination of that machine and tell what he thought about it. After making the examination, Bagley stated he was willing to put some money into it. Then the question came up "about handling the Dickinson Cord Tire Company stock." They finally agreed to take over the issue and form a company. After still further examination, the N. R. Bagley Company was formed to "sell said stock to the public in a small way." Associated with Bagley and Clayton were Whitman and Sheetz, and together they operated under a partnership entitled N. R. Bagley & Co. Later on, the partnership was incorporated as N. R. Bagley & Co., Inc., for the purpose of selling securities, etc., and at a later period members of the said petitioner financed, promoted and took over the sale of the stock of the Double-Service Washing Machine Company.

It is contended by the Commonwealth that the business methods of the security selling firm of Dubiske & Co., of Chicago, were so very objectionable that this firm closed out its business in Pennsylvania and left July 31, 1923, before the Securities Act of 1923 went into force and effect. It was the practice of Dubiske & Co. to sell securities largely to poor people. They were experienced stock salesmen of promotion securities, and would recruit a large stock selling force from trades and professions with no experience in stock selling investment business whatsoever, which stock salesmen were required to sell the securities to their fellow-members in their labor organizations, fellow club members, fellows working in trades, mills and factories with them. (Notes of Testimony, pages 124 to 132, inclusive, 163, 164, 186, 188, 189 and 190.)

Vice-president Sheetz, of Bagley & Co., Inc., was one of these salesmen. Deputy Banking Commissioner Barfod testified that when he inquired of Mr. Sheetz why he left Dubiske & Co., Sheetz replied: "Well, Dubiske did not live up to his agreements, and that is why we left and started out for ourselves, and we got Mr. Bagley, who was a reputable business man of Newark, to back us, to finance us, give us the money to start this new investment company with." (Notes of Testimony, page 164.)

Section 7 of the Securities Act provides, *inter alia:* "If the commissioner is satisfied that the applicant is of good repute, and that the proposed plan of business of the applicant is not unfair, unjust or inequitable, he shall register the applicant," etc.

The applicant in this case being organized and incorporated, *inter alia,* for the purpose of selling the stock of the Dickinson Cord Tire Corporation, and,

later, for the purpose of financing and selling the stock of the Double-Service Washing Machine Company, has no reputation except the reputation it has acquired by promoting and selling these stocks. It has not been in the business of selling any other securities, and, therefore, has had no opportunity to acquire a good reputation, except as shown by the evidence in this case. The reputation of Bagley, the president of this corporation, is not questioned. We think that, in order to ascertain what the good repute of the applicant is, it was necessary for the Commissioner of Banking, under section 5 of the Securities Act, to inquire as to the applicant's "previous history, record and associations," and this applies not only to the applicant for registration as a dealer, but also to the application of the registered dealer for the registration of agents or salesmen, under section 10 of said act.

We come next to consider what is meant by the term "plan of business of the applicant." The word "plan" is defined by the Century Dictionary to be "a formulated scheme for the accomplishment of some object or the attainment of an end; the various steps which have been thought out and decided upon for the carrying out of some project or operation." Webster defines the word "plan" to be a "scheme; device; method of action or procedure expressed or described in language; a project; as, the plan of a constitution; the plan of an expedition;" and the last edition of the Standard Dictionary defines the word to mean: "to form a scheme or method for the doing of; entertain as a project; with a prospect of effecting or performing; devise ways and means of accomplishing; contrive; as, to plan a work; to plan a rescue; a methodic arrangement of the various means of successive steps believed to be necessary or conducive to the attainment of some object; a formulated scheme for reaching some result; contrivance; method; as, the plan of an expedition; a plan of attack."

We think, therefore, that the plan of doing business of the applicant as contained in this act must be construed to mean a formulated scheme for the accomplishment of the object or attainment of the end sought to be established by the petitioner in the sale of securities, including the various steps which have been thought out and decided upon for the carrying out of the said project or operation. Whatever methods have been adopted by the company for the purpose of putting the stocks and securities upon the market and selling them to the public must be included in and form a part of the plan of doing business of the petitioner. We think, also, that when, as in this case, it appears from the evidence that there are certain inequitable methods of stock distribution on the part of the corporations issuing the securities to be sold which have the adoption and approval of the petitioner, then said schemes for the distribution of the stock of said corporations must be construed to be a part of the plan of doing business of the petitioner.

One of the chief objections to the proposed plan of business of the applicant was that it advertised that it would repurchase the stock of dissatisfied investors (Notes of Testimony, page 146). It is claimed by the Commonwealth that this was a Dubiske plan of doing business which was engrafted into the plan of Bagley & Co., Inc., the applicant. The sales manager of the Philadelphia office of Bagley & Co., Inc., was Rev. Mr. Radcliffe, a Methodist minister, who took great pride in the fact that he would buy back anything that he sold. Mr. Barfod asked him how this was possible, to which Mr. Radcliffe replied: "Well, you know that is the only reason why I was particularly willing to become associated with N. R. Bagley & Co. It is my ideal of the golden rule in the investment business that whatever you sell you should be willing to buy back, and, as our Mr. Whitman said, any time we can't do that,

4 D. & C.

it is time to quit business" (Notes of Testimony, page 166). Mr. Barfod directed Mr. Radcliffe's attention to the fact that the resale clause did not appear on the more recent literature of Bagley & Co., to which he replied: "It is still the policy of our company, and just as Mr. Whitman said, 'any time we can't do that, it is time for us to quit business,' and that was an ideal of the golden rule in the investment business, applying the golden rule in the investment business" (Notes of Testimony, page 167). Mr. Radcliffe took the witness-stand in rebuttal, but did not specifically deny that he made these statements to the witness Barfod. When questioned as to his statements to the Deputy Commissioner of Banking (Notes of Testimony, page 222), the witness said: "I didn't use that phraseology. . . . I told him that the 13th statement had been taken off and that literature had been recalled, and that we were notified to that effect, not to present the stock with the idea that the company said 'we still in exceptional cases do return money.'" When we inquired of the witness what he meant by the golden rule, he replied: "Well, I felt the company was conducted in a fair, square way; in an honest way; that they had investigated these propositions and they had stated the result of their investigations and the fact that they would return money to these individual cases, these exceptional cases, seemed to me to be really the principles of the golden rule. That is the square deal idea. I was impressed with the [fact that the] method in which the company did business was according to the principles of the golden rule, or the square deal idea" (Notes of Testimony, page 223). We conclude, therefore, that the testimony given by Deputy Banking Commissioner Barfod, relating to the statements made by Radcliffe, were substantially correct, and that his testimony is practically corroborated by Mr. Radcliffe's answer to our question.

It does appear that when Mr. Bagley's attention was directed to paragraph 13 of the statement of facts regarding the Double-Service Washing Machine Company, which provided, "It is the policy of this company to repurchase stock of all dissatisfied clients," he wired the company to withdraw this statement because it was not sound, and in this conclusion we are in accord with Mr. Bagley's testimony that such business principle on the part of a dealer in securities is not sound. The dealer sells the stock and turns over the proceeds to the corporation whose stock he is selling. How, then, could he, as a dealer, agree to return the money and repurchase the stock? It seems to us that only the corporation whose stock is being sold could make such a contract, and that a promise made by a dealer in stock to repurchase the stock if the buyer was dissatisfied would be a promise incapable of performance. The only purpose of such a promise, in our opinion, would be to delude and deceive ignorant purchasers of securities and lull them into a feeling of apparent safety. While it is true that paragraph 13 was removed from the statement of facts regarding the Double-Service Washing Machine Company, especially as said statement of facts appears upon the latest sales contracts, nevertheless, there was offered in evidence a statement of facts regarding said company on the cash order blank in which said promise again appears in paragraph 12. When this paragraph was directed to the attention of Mr. Bagley, he stated that it must have been a mistake of the printer (Notes of Testimony, page 73). He testified it never was the policy of the Bagley Company to guarantee to repurchase the stock of any dissatisfied holder of Dickinson stock (Notes of Testimony, page 22). He admits his company did guarantee some of the stock sold in the Double-Service Washing Machine Company up to $10,000 (Notes of Testimony, page 23). It very clearly appears from the evidence, therefore, that at least in the sale of the stock of the Double-Service

Washing Machine Company there was a guarantee to repurchase the stock sold up to $10,000; that the sales agent of Bagley & Co., Inc., in Philadelphia, was selling stock for said company upon the basis of the golden rule, that whatever the company had for sale, it would be willing to repurchase, and that while the Bagley Company withdrew from its statement of facts regarding Double- Service Washing Machine Company, paragraph No. 13, stating it is the policy of this company to repurchase stock of all dissatisfied clients, said paragraph was again included as one of the statements of fact in paragraph 12 of the cash order blank issued by said Bagley & Co. We think this proposed plan of business of the applicant was unfair, unjust and inequitable.

It appeared from the evidence (Exhibit C—Notes of Testimony, page 44) that a further plan of doing business of Bagley & Co., Inc., was to automatically advance the price of the Dickinson stock it was selling from time to time as the corporation assets are enhanced in value in the progressive stages of manufacturing activity—see paragraph 18, Exhibit C. The effect of this policy was to expedite the sale thereof. This automatic advancement in the price of the Dickinson Cord Tire Corporation stock was not justified by the financial condition of the said corporation. The petitioner started the sale of the said stock of the Dickinson Cord Tire Corporation at $20 per share, and advanced the price thereof from time to time until it was selling said stock at $60 a share, notwithstanding the fact that the capital stock of this company was very greatly impaired and the company without any production; not a machine had been manufactured and leased to any cord tire concern, and not one machine out anywhere on royalty or earning anything (Exhibit A—Notes of Testimony, pages 39, 40, 202). In like manner the stock of the Double-Service Washing Machine Company was advanced from $10 to $20 when the company was not on a production basis; it had no earnings or other accretion of assets and no possible excuse for selling at more than the original offer. When questioned about this, members of Bagley & Co. said to Mr. Barfod: "Well, we are making progress; we are developing the machine; we are making progress; we are taking in more money. Look at our receipts now and look at our receipts last month." These receipts were all derived from the sale of stock, so that, when the company took in money for stock and acquired more money by selling stock, they were also acquiring more stock liability. It further appeared from the testimony that these advances in the price of stock being sold by the Bagley & Co., Inc., were announced in advance to serve as a stimulant to prospective purchasers. While this plan of doing business would naturally stimulate the sale of stocks, we think it was also calculated to deceive purchasers unfamiliar with securities and lead them to believe that the corporation whose stock they were buying was on a productive basis, otherwise the stock would not advance. We think this plan of doing business on the part of Bagley & Co. was also unfair, unjust and inequitable.

It did not appear very clearly that paragraph 4 of the "statements of facts regarding Dickinson Cord Tire Corporation," issued by Bagley & Co., Inc., which provided, "development, experimental and patent expenses over a period of eight years have exceeded $400,000," was true. It did appear that stock to about the amount of about $400,000 had been issued by Dickinson to some of his friends who had advanced him money to carry on his experiments, but we are not satisfied from the evidence that the amount of money expended by Dickinson himself, either from his own funds or from those advanced by others, amounted to nearly the sum of $400,000, and, therefore, this statement was calculated to deceive, and probably did deceive, the public who were solicited to purchase this stock.

4 D. & C.

Paragraph 6 of said "statements of facts" regarding Dickinson Cord Tire Corporation, which provided "Without solicitation a market for over 200 machines from leading tire manufacturers is presented to us," is not supported by the evidence. It may well have been in the mind of the dealer in this case that there were many manufacturers of cord tires who might purchase this machine if its utility were demonstrated, but in the mind of the prospective purchaser, unfamiliar with the value of securities, the impression would probably be created that at the time the statement was issued 200 tire manufacturers had sent in orders for 200 machines. This impression would naturally lead prospective purchasers to believe that the corporation was in a healthy condition and in production. We think such statement was misleading, unfair, unjust and inequitable.

It appears from the testimony relating to the petitioner's plan of business with regard to the organization and sale of the stock of the Double-Service Washing Machine Company that this company was organized by three members of Bagley & Co., Inc., the petitioner in this case, and incorporated with a capital stock of 50,000 shares, no par value. The incorporators were P. G. Whitman, Fred H. Whitman and Claudia Hankinson; Mr. Clayton, Mr. Shepherd, Mr. Sheetz and Mr. Bagley came into said company later. Claudia L. Hankinson, one of said incorporators, was a book-keeper in the office of Bagley & Co. After said Double-Service Washing Machine Company was incorporated, 26,000 shares of the capital stock were issued to the inventors and designers for their drawings, designs, patent and model machine, and for their services. This stock was put in escrow in the hands of P. G. Whitman, treasurer of Bagley & Co. The stock was never delivered to Dien, the inventor, but was distributed by his order as follows: Bagley was given 1000 shares; N. R. Bagley & Co., Inc., received 11,000 shares; Clayton, who was a member of the firm, received 1000 shares; Paul H. Whitman 2000 shares; Charles D. Sheetz 1000 shares; George Kabereck, who was made president of the company, received 5000 shares, and, with the exception of the stock issued to Kabereck and the inventors, the shares were divided among either the Bagley & Co., Inc., or its officers, for which about $5000 was paid. P. G. Whitman, treasurer, testified that he distributed 1000 shares of the Double-Service Washing Machine Company to Bagley because Mr. Dien, one of the inventors, authorized him to so issue it (Notes of Testimony, page 142); that Bagley had no interest in the Double-Service Washing Machine Company patent; that Bagley & Co. got 11,000 shares for financing the company, and Bagley & Co., Inc., also received 25 per cent. commission for selling the stock in addition to the 11,000 shares. It also appeared that the stock was selling latterly at $20 a share, which would indicate that Bagley & Co., assuming the stock to be worth $20 a share, received $220,000 for financing this company, and, in addition thereto, received 25 per cent. commission for selling the treasury stock. In the same way, Mr. Clayton, who had no interest in the patent, received 1000 shares. The witness, Whitman, received 2000 shares for which he paid $2000, and Sheetz 1000 shares, for which he paid $1000 (Notes of Testimony, pages 143-154). This stock was not actually issued to Dien, but under the contract it was to be issued "to him or to whom he should designate."

The treasury stock, amounting to 24,000 shares, as we have before indicated, was first sold by Bagley & Co. for $10 a share, then the selling price was advanced to $15 and then to $20, and that probably $100,000 worth of this stock was sold, netting the company about $75,000. It does not appear

in the testimony or in the exhibits that the purchasers of the treasury stock, for which some of them paid $20 a share, were informed that the company selling them the stock had received 11,000 shares as a gratuity, and, in addition, was receiving 25 per cent. commission for selling the stock. We think this plan of doing business on the part of the petitioner was unjust, unfair and inequitable to the purchasers of the treasury stock, as the 24,000 shares, which were sold, or were to be sold, for as much as $20 a share, were to bear the burden of putting said corporation upon a dividend paying basis without cost to the owners and holders of the 26,000 shares of stock issued, as we have above indicated, to persons only two of whom paid anything for their stock, and those two only paying at the rate of $1 a share. Certainly it cannot be claimed that such a plan of doing business on the part of the petitioner was either fair, just or equitable.

It is further alleged by the petitioner in one of its circulars that in the sale of the Dickinson Cord Tire Corporation stock it was selling to the public an "initial offering" of stock of said corporation. This statement was not true, as it appears from the evidence that some of the stock had been sold prior to the time when the Bagley & Co., Inc., was organized for the purpose of selling this stock. It is quite true Bagley states that what he meant was this was an "initial offering" so far as Bagley & Co. was concerned, but it does not appear anywhere in the evidence that he or any of his salesmen explained their understanding of the statement to the buying public. Without such explanation, it would naturally appear to the intending purchaser that for the first time this stock was placed upon the market, which might tend, and probably did tend, to enhance the value of said stock in the eyes of the prospective purchaser. We think this and any other statement embraced in our findings of fact made by the petitioner or its salesmen calculated to stimulate the sale of stock, but not based upon the truth, constituted a plan of doing business on the part of the petitioner which was unjust, unfair and inequitable, and, therefore, justified the Commissioner of Banking in refusing to register this corporation as a dealer under the Securities Act.

It further appears in one part of the statement of facts issued by Bagley & Co., Inc., that the Dickinson Cord Tire Corporation "is manufacturing machines which 'are installed under license by which royalties are guaranteed'" (Exhibit D). This statement is admittedly untrue. It appeared from the evidence that the Dickinson Cord Tire Corporation had not manufactured and installed, under license, any machine for the manufacture of cord tires, and, therefore, no royalties were guaranteed. An effort was made at the trial to explain this statement by the suggestion that machines would be installed in the future; but would an intending purchaser of these securities find anything in the statement of facts, from which we have quoted, which would indicate that the machines of the Dickinson Cord Tire Corporation were to be installed in the future? The language of the statement of facts is "are installed under license." This statement on the part of the petitioner was clearly misleading, and we conclude that said statement formed a part of the proposed plan of doing business of the petitioner which was clearly unfair, unjust and inequitable to the public.

Section 9 of the said Securities Act directs that our decision "shall consult only the rights of the plaintiff and the protection of the public." Having due consideration, therefore, for the rights of the plaintiff in this case, we, nevertheless, decide from the weight of the evidence that the protection of the public imperatively requires us to conclude that the proposed plan of doing

N. R. Bagley Co., Inc., *v.* Cameron, Commissioner of Banking.

business of Bagley & Co., Inc., is unfair, unjust and inequitable, calculated to mislead unthinking and uninformed prospective purchasers, and that, therefore, the official act of the Commissioner of Banking, refusing to register the plaintiff as a dealer under the Securities Act, must be for the protection of the public, and the same is hereby affirmed.

### Conclusions of law.

1. The proposed plan of business of the applicant is unfair, unjust and inequitable.

2. The Commissioner of Banking, in refusing to register the petitioner, proceeded in conformity with the Securities Act of 1923, and is affirmed, and the petition of N. R. Bagley & Co., Inc., is dismissed, at the cost of the petitioner.

From George R. Barnett, Harrisburg, Pa.